IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2000

## STATE OF TENNESSEE v. REGINALD D. TERRY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-03934     W. Fred Axley, Judge**

---

**No. W2000-00090-CCA-R3-CD - Filed June 26, 2001**

---

The Defendant was convicted by a Shelby County jury of attempted aggravated burglary. The Defendant was sentenced as a Range I, standard offender to three years incarceration. The Defendant now appeals, arguing that (1) in spite of his untimely motion for a new trial, this Court should consider each issue he has presented on appeal, (2) there was insufficient evidence to support a conviction against the Defendant for attempted aggravated burglary, (3) the trial court erred in refusing to instruct the jury on the lesser-included offenses of aggravated criminal trespass and criminal trespass, (4) the trial court made an improper comment on the evidence in violation of the Tennessee Constitution, and (5) the trial court erred in allowing in rebuttal proof of other crimes committed by the Defendant. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

W. Mark Ward, Assistant Public Defender (on appeal); Timothy J. Albers, Assistant Public Defender; and William Yonkowski, Assistant Public Defender, Memphis, Tennessee, for the appellant, Reginald D. Terry.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Julie Mosley, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. FACTS

Jessie Maple testified that on November 13, 1997, at around 4:30 or 5:00 in the morning, she was sitting on the couch in her living room looking at a catalogue. Maple testified that she was up late because the medication she was taking inhibited her from sleeping. There was a light on in the

living room, and the television was on. Maple testified that she "heard these legs going around the edge of [her] house right by the window." Maple testified that she first thought the noise was a squirrel, but soon realized that someone was at her window. Maple testified that it sounded like someone was "fumbling with the screen." Maple testified that she opened the blinds slightly so that the person would see that someone was awake inside the house. When Maple opened the blinds, the noise stopped.

Maple then turned off all the lights in her house, called her neighbor, S. Q. Williams, and asked him to look out his window and tell her if he saw anyone outside by her house. Williams told Maple that he didn't see anyone outside. Maple testified that she then heard a noise on her porch and went to the door to check it out. She testified that she had to wipe off the glass door because there was condensation on it. She looked outside and to the left and saw the Defendant. Maples said she slammed the door and went back into her living room. She testified, "I just lost it, I didn't know what to do." About that time, her neighbor called and told Maple that a man was on her porch. Williams then told Maple that the man walked around and got on the sidewalk. Maple testified that she hung up the phone and went to her door. At that time, she saw the Defendant on the sidewalk, going away from her house. Maple testified that the Defendant would periodically turn around and look at her house. Maple also testified that the light bulb was missing from her front porch. However, there was a street light just down from Maple's house. Maple testified that the Defendant did not make any threats, and no damage was done to the house.

Later that morning, Maple talked to the police and gave them a description of the Defendant. Maple told the police that the man at her house was a black male with broad shoulders who was not short. Maple told police that the man had a light-colored hood on his head. Maple also identified the Defendant in a line-up and in court as the man that was on her porch.

S. Q. Williams testified that he lived across the street from Maple and that on November 13, 1997, Maple called him and said that someone was outside her house. Williams testified that when he first looked outside, he didn't see anyone and got off the phone with Maple. Williams testified that he looked again a few minutes later and saw a man at Maple's window. Williams testified that the man walked around to the front of Maple's house, up onto her porch, and to her front door. Williams testified that he called Maple when he saw the man walk around to the porch. As soon as Williams called, the Defendant began to leave. He testified that he did not see the man's face and could not give a description other than that it was a tall man, approximately six feet, six or seven inches tall, wearing a loose coat with a hood. Williams also testified that it looked like the man had a limp. Immediately after the incident, Williams told the police that the man was wearing a two-toned jacket. He said that it looked like it was a light color and a dark color, and the sleeves were two-toned. At trial, when shown a picture of the Defendant's jacket, Williams testified that he could not tell if that jacket was the one that he had seen on the night of the incident.

Officer John Hughes of the Memphis Police Department was working, along with his partner, Officer Anthony Morris, in Maple's neighborhood on the evening of the offense. Hughes testified that he was in that area looking for someone based on a description he had received. That

description was "male black, approximately six two. Wearing plaid jacket, white multicolored, dark pants." Hughes testified that he saw the Defendant around 4:00 in the morning, and he matched that description. Hughes testified that he first saw the Defendant coming from the backyard area of a residence in the eight hundred block of Claybrook. The Defendant "walked toward the front of the house and stood right there in the front sidewalk area." The street that is located behind the house where Hughes saw the Defendant was Alaska Street, which is where Maple lived. The house where the Defendant was spotted was his mother's house. Hughes testified that he was wearing a plaid jacket. Hughes testified that he searched the Defendant, but did not find any weapons.

Officer Anthony Morris of the Memphis Police Department testified that on November 13, 1997, he and his partner, Officer Hughes, were responding to a rape call on Alaska Street. Morris testified that he and Hughes went down Claybrook, which was one street over from Alaska. Morris testified that he saw the Defendant walking through a vacant lot next to 860 Claybrook. Morris testified that the Defendant was wearing a multi-colored jacket.

Sergeant T. D. Jackson of the Memphis Police Department was assigned to the Crime Scene Unit on the night of the offense. Jackson responded to the call at Maple's residence, 831 Alaska Avenue. Jackson testified that he was called to the scene to take some photographs of the exterior portion of a structure. Jackson also processed the front light fixture along with the light bulb for fingerprints, but was unable to obtain any usable prints. The Memphis Police Department Crime Scene Report, which was filled out by Jackson, stated that the light bulb was removed from the fixture on the front porch of Maple's residence. On that same night, Jackson also went to 860 Claybrook Street where he tagged a jacket as evidence.

Geneva Terry, the Defendant's grandmother, lives at 860 North Claybrook and testified that the Defendant was living with her on November 13, 1997. Terry testified that she went to sleep around 11:00 the night before and that the Defendant was in the house watching television. Terry testified that she got up "a little after five" in the morning and "went in the living room and Reggie was [a]sleep" on the couch.

Deina Fisher lives in the same neighborhood as Maple and testified at the Defendant's trial. Fisher testified that between 2:30 a.m. and 3:30 a.m. on November 13, 1997, she and her cousin, Ceddrena Fisher, were awakened by a man standing in the bedroom. She later identified this man as the Defendant. On the day following the incident, Fisher gave her statement to the police. In it, Fisher stated that she "was unable to see his face but [she] could see his clothing and his body size." She stated that the offender "had on a white baseball cap turned backwards and a green and white checkered like plaid, waist length coat." Fisher stated that she did not think she would be able to identify the offender again "by face." However, Fisher identified the Defendant as the offender in a line-up. Fisher also identified the Defendant's jacket as the one he wore on November 13, 1997.

Ceddrena Fisher also testified regarding the events on November 13, 1997. Fisher testified that a man entered her bedroom between 2:00 and 3:30 on that morning. Fisher testified that she got a good look at the offender because her neighbors have a bright light that shines through her window.

Fisher also identified the Defendant as the man that was in her bedroom. Fisher also identified the Defendant's jacket as the one he was wearing that night.

## II. ANALYSIS

### A. Late-Filed Motion for New Trial

The Defendant argues that his late-filed motion for a new trial should not result in a waiver of any of the issues he now raises on appeal. Specifically, the Defendant argues that the notice of appeal was untimely filed because the time for filing the notice of appeal was not tolled by the filing of a motion for a new trial. The Defendant concedes that his motion for a new trial was not filed within thirty days after a judgment was entered as required by the Tennessee Rules of Criminal Procedure 33(b). The Defendant argues that his trial counsel failed to file a timely motion for a new trial because defense counsel misunderstood the requirements for doing so. The Defendant argues that his counsel on appeal did not realize trial counsel's error until twenty days before the opening brief was due, and thus addressed the issue in the brief. The Defendant argues that he should not lose the right to appeal all issues due solely to the errors of his attorney and that any reason that would justify the granting of a delayed appeal pursuant to Tennessee Code Annotated § 40-30-213 should be sufficient to justify a waiver.

Pursuant to Tennessee Rule of Appellate Procedure 4(a), we may waive the filing of a notice of appeal in the interest of justice. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). We choose to do so in this case. However, "[u]nlike the untimely filing of the notice of appeal, this Court does not have the authority to waive the untimely motion for a new trial." State v. Patterson, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). A motion for a new trial must be filed within thirty days of the date the order of sentence is entered. Tenn. R. Crim. P. 33(b). This requirement is mandatory, and failure to file a timely motion for a new trial deprives the defendant "of any opportunity to argue on appeal the issues that should have been presented in the motion for new trial." State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980); Tenn. R. App. P. 3(e).

In this case, the Defendant failed to file a timely motion for a new trial. Because Tennessee Rules of Criminal Procedure 33(b) is mandatory, the Defendant lost his right to argue issues upon which a new trial was sought, but we may review those issues that would result in a dismissal. See Davis, 748 S.W.2d at 207. The consequence of the Defendant's failure in this regard is that the judgment entered by the trial court became final thirty days after its entry, and the Defendant waived all claims on appeal other than the sufficiency of the evidence. See Tenn. R. App. P. 3(e), 13(e); Patterson, 966 S.W.2d at 440; Givhan, 616 S.W.2d at 613.

### B. Sufficiency of the Evidence

The Defendant argues that there was insufficient evidence to support a conviction against him for attempted aggravated burglary. Specifically, the Defendant argues that the evidence was

insufficient to support a finding that he knowingly attempted to enter the habitation of the victim with the intent to commit an assault.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

We conclude that there was sufficient evidence to convict the Defendant of attempted aggravated burglary. Aggravated burglary occurs when an individual enters a habitation "without the effective consent of the property owner" and, as indicted in this case, with the intent to commit an assault. Tenn. Code Ann. §§ 39-14-402, -403. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). A person commits assault who:

(1) [i]ntentionally, knowingly or recklessly causes bodily injury to another;

(2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Id. § 39-13-101(a)(1)-(3).

There was sufficient evidence for a rational trier of fact to find the Defendant guilty of attempted aggravated burglary. Viewing the evidence in the light most favorable to the State, the Defendant was fumbling with the screen on Maple's side window. When Maple turned on some lights, the noise stopped, and the Defendant moved around to the front of the house. Maple went

to her front door and saw the Defendant hiding just off the porch. Maple closed the door and went into her living room. The Defendant remained for a few more minutes until Williams called back. When Maple looked outside again, she noticed that the light bulb had been unscrewed from the fixture on her front porch, and she saw the Defendant walking down the street.

From the aforementioned evidence, a reasonable jury could have concluded that the Defendant was trying to gain entry to the house through the window. When Maple turned on the lights and opened the blinds, the Defendant simply moved to the other side of the house, but did not leave. The jury could have reasonably concluded that the Defendant knew Maple was in the house because the noise stopped and that he moved around to the front porch when Maple turned on the lights. The jury also could have concluded that the Defendant left because he heard the phone ring when Williams called Maple. The Defendant continued to take substantial steps towards gaining entry to Maple's home despite the fact that he was aware that she was home. This evidence could lead a reasonable jury to conclude that the Defendant intended to enter the house and assault Maple.

In addition, the jury heard evidence that there was another assault in the neighborhood that night. The Defendant attempted to provide an alibi for his presence at Maple's residence; however, a woman staying in a house nearby testified that the Defendant assaulted her earlier that morning. Thus, there was sufficient evidence for the jury to have found the Defendant guilty of attempted aggravated burglary.

We have carefully reviewed the record pertaining to the issues raised in the Defendant's brief that were waived by his failure to file a timely motion for new trial. Our review reveals no plain error, that is, no error which has affected the substantial rights of the Defendant. Tenn. R. Crim. P. 52(b).

Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE